# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE MCNAUGHTON GROUP, LLC, a Washington limited liability company, | ) ) ) | No. 70064-2-I |
| Respondent, | ) ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| HAN ZIN PARK and REGINA KYUNG PARK, husband and wife, and the marital community property comprised thereof, | ) ) ) ) ) | |
| Appellants, | ) ) ) | |
| WINDERMERE REAL ESTATE COMPANY, a Washington corporation; JULIE MANOLIDES and JOHN DOE MANOLIDES, husband and wife, | ) ) ) ) ) | |
| Third Party Defendants. | ) ) | FILED: March 31, 2014 |

APPELWICK, J. — The Parks appeal the denial of their motion for summary judgment, arguing that their real estate contract with TMG was void for lack of legal description. TMG asserts that the Parks waived this affirmative defense. The Parks also make several evidentiary assignments of error. We affirm.

## FACTS

In 2004, Han and Regina Park negotiated with The McNaughton Group LLC (TMG) over sale of the Parks' property in Edmonds, Washington. That September, the parties drew up a purchase and sale agreement (2004 PSA) with a purchase price of $2,425,000. However, the negotiations ultimately fell through.

In early 2005, the parties resumed negotiations for sale of the property. Initially, TMG offered the Parks $2,400,000. The Parks counter-offered with $2,425,000, which

TMG accepted. The parties executed the new purchase and sale agreement (2005 PSA) on or about February 28, 2005.

Before closing, however, the parties sparred over the terms of the contract, namely the purchase price. The Parks argued that, contrary to the terms of the 2005 PSA, an additional $180,000 was due. The closing date was set for September 11, 2006. Ultimately, however, the Parks did not close on the property.

TMG filed suit against the Parks for breach of contract and filed a lis pendens on the property. The Parks counterclaimed and argued that it was TMG who breached the contract. The Parks later moved for summary judgment, asserting that the 2005 PSA was void for lack of legal description. The trial court denied their motion, finding that they had waived the statute of frauds as a defense.

The case proceeded to trial on January 22, 2013. The jury ultimately found for TMG. The Parks appeal.

## DISCUSSION

### I. Motion for Summary Judgment

The Parks argue that the trial court improperly denied their motion for summary judgment. This court reviews a trial court's summary judgment order de novo. Korslund v. DynCorp Tri-Cities Servs., Inc., 156 Wn.2d 168, 177, 125 P.3d 119 (2005). Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Id. This court construes the facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. Id.

2

## A. Waiver of Statute of Frauds Defense

The Parks first contend that the trial court erred in finding that they waived the statute of frauds defense. CR 8(c) establishes that the statute of frauds is a defense that must be affirmatively set forth by a party. Generally, affirmative defenses are waived unless (1) affirmatively pleaded; (2) asserted in a CR 12(b) motion; or (3) tried with the parties' express or implied consent. Henderson v. Tyrrell, 80 Wn. App. 592, 624, 910 P.2d 522 (1996). The policy behind this rule is to avoid surprise. Id. Where that policy is not a concern, and the failure to affirmatively plead a defense does not affect the substantial rights of the parties, we will consider noncompliance harmless. Id.

In Henderson, the trial court refused to instruct the jury on nonparty fault, an affirmative defense that the defendant failed to raise in any responsive pleading. Id. at 621-22. The appellate court found that this was not an abuse of discretion. Id. at 625. It reasoned that the defendant was aware of the issue and did not raise it during the many months before trial. Id. To allow him to raise the defense right before trial, the court stated, would require the parties to engage in substantial new discovery. Id.

By contrast, in Bickford v. City of Seattle, this court found that the trial court abused its discretion in ruling that the defendant failed to timely raise its affirmative defense of setoff. 104 Wn. App. 809, 813, 17 P.3d 1240 (2001). There, the defendant did not expressly plead the defense in its answer. Id. at 814. But, this court reasoned, the parties had impliedly consented to try the issue by discussing setoff with the court and agreeing about how it would be presented and the figures that would be used. Id.

3

Here, the court made the following findings:

1. This case was filed on September 28, 2006;
2. The Parks never mentioned or ple[a]d[ed] the Statute of Frauds in their answer, counterclaims, or third party claims;
3. The discovery cut-off date was May 21, 2012,
4. This motion was noted for May 30, 2012, a date after the discovery cut-off; and
5. The Parks raised the Statute of Frauds as a defense for the first time in this motion.

To permit the Parks to raise the Statute of Frauds at this late date would be unduly prejudicial and unfair to Plaintiff.

The Parks argue that these findings ignored their pleadings and that they had openly contested the contract.

It is true that the Parks challenged the 2005 PSA in their answer to TMG's complaint, but their arguments involved the purchase price. There was no mention of the statute of frauds or concern about the legal description of the property. Nor was there mention of those issues in any of their many subsequent pleadings.

Like the defendant in <u>Henderson</u>, the Parks failed to raise their affirmative defense in their responsive pleadings. They were able to raise the statute of frauds defense earlier, having had access to the 2005 PSA since the beginning of the lawsuit. But, for six years, the Parks did not raise an issue about the legal description of the property. And, when they did raise the issue, it was not until discovery had concluded. There is no evidence that, as in <u>Bickford</u>, the parties had consented to try the issue. The policy concerns behind the affirmative pleading rule thus apply here.

The trial court did not err in finding that the Parks waived the statute of frauds defense.

4

B. Statute of Frauds: Adequate Legal Description

Even if the statute of frauds defense had not been waived, denial of summary judgment motion was proper. Under the statute of frauds, a contract for the sale or conveyance of real property must include a legal description of the property. Pardee v. Jolly, 163 Wn.2d 558, 566-67, 182 P.3d 967 (2008). An inadequate legal description renders a contract void. Maier v. Giske, 154 Wn. App. 6, 15, 223 P.3d 1265 (2010). A valid legal description for platted property must include the lot number, block number, addition, city, county, and state. Martin v. Seigel, 35 Wn.2d 223, 229, 212 P.2d 107 (1949). The description may appear in the contract itself, or the contract may reference another instrument that contains a sufficient description. Bigelow v. Mood, 56 Wn.2d 340, 341, 353 P.2d 429 (1960).

Here, the legal description reads:

The real property ("Property") located at 7704 Olympic View Dr., 18314 Olympic Vw Dr., 18408 79th AV W, 18325 80th AV W, Edmonds Wa, ("homes and land"), Tax Parcel ID #'s 00370800301000, 00370800100900, 00370800101100, 00370800101200 and Tract 106, Edmonds Sea View Tracts as per plat recorded in volume 3 of plats page 76, records of Snohomish County, 00434600010601.

The description includes the city, county, and state where the property sits.

TMG argues that this legal description is sufficient and cites to Bingham v. Sherfey, where the court approved a legal description that identified a property using its tax parcel number. 38 Wn.2d 886, 889, 234 P.2d 489 (1951). The Parks counter that Bingham does not apply, because it establishes requirements for only unplatted property.

The Parks are correct: it is not Bingham, but Martin that establishes legal description requirements for platted property. See 35 Wn.2d at 229. The legal

description here meets three of Martin's requirements—city, county, and state—but does not include the property's lot number, block number, and addition. This is an insufficient legal description on the four corners of the document.

However, TMG also argues that the 2005 PSA referred to another instrument with a sufficient description. If parties to a contract clearly and unequivocally incorporate by reference another document, that document becomes part of the parties' contract. Satomi Owners Ass'n v. Satomi, LLC, 167 Wn.2d 781, 801, 225 P.3d 213 (2009). This allows the parties to incorporate terms by reference to a separate agreement, including an agreement that is not physically attached. Knight v. Am. Nat'l Bank, 52 Wn. App. 1, 4-6, 756 P.2d 757 (1988). It must be clear that the parties knew of and assented to the incorporated terms. W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc., 102 Wn. App. 488, 494-95, 7 P.3d 861 (2000). The provisions referenced must have a reasonably clear and ascertainable meaning. Id. at 494.

At issue here are two documents: the 2005 PSA and the 2004 PSA. The 2005 PSA has a typed date of February 18, 2005. TMG signed the 2005 PSA on February 19, 2005, and the Parks signed it on February 20, 2005. The 2005 PSA states that it includes the following: "Addendum," "Promissory Note" and "counter addendum + 3 pages of prior addendum." Attached to the PSA are the following: a four-page document entitled "Addendum to Purchase and Sale Agreement"; a promissory note; a document called "Addendum B to Purchase and Sale Agreement Date 2/19/05"; and three additional pages of terms.

Addendum B contains a handwritten note designating it as a "counteroffer." The addendum states that:

> In the event, <u>if there arise any dispute</u> over the scope of the applicable clause(s) on Specific terms of Addendum 1 through 14, (dated 2/19/05)., [sic] <u>Precious [sic] agreement executed on September 8, 2004</u>, page 1 through 13, <u>supercedes [sic] and replaces any provision</u> on the topics contained in purchase and sale agreement proposed and executed on February 19, 2005.

(Emphasis added.)

The 2004 PSA has a typed date of September 2, 2004. TMG signed the 2004 PSA on September 2, 2004, and the Parks signed it on September 8, 2004. The 2004 PSA includes an addendum listing the full legal description of the properties.

TMG argues that, by virtue of Addendum B, the 2005 PSA incorporates the 2004 PSA. The language of Addendum B clearly and unequivocally incorporates a previous agreement executed on September 8, 2004. The parties signed Addendum B, demonstrating that they knew of and assented to its terms. The Parks contend, however, that a September 8, 2004, agreement does not exist. While September 8 does not correspond with the typed date of the 2004 PSA, it does correspond to the date upon which the Parks signed the PSA. The record does not contain any other document with that date, nor do the Parks allege that Addendum B refers to another particular document. The agreement referenced thus had a reasonably clear and ascertainable meaning.

The Parks further contend that Addendum B is not a lawful part of the 2005 PSA. This is so, they maintain, because the 2005 PSA does not on its face refer to an "Addendum B." The Parks are correct that the 2005 PSA does not specifically refer to Addendum B, but to a "counter addendum." But, Addendum B is identified as a

7

"counter offer." It was stamped and initialed by the parties on February 28, 2005, the same date that the 2005 PSA was stamped and initialed. And, the documents that the 2005 PSA lists as attachments correspond in number and type to the documents attached to the executed 2005 PSA. This includes Addendum B.

In their briefs, the Parks do not argue that "counter addendum" refers to another document in particular. Before trial, they asserted that it referred to a document increasing the purchase price. TMG disputed this, noting that the document bore only the Parks' initials and that TMG never saw the document until the closing date had passed.

The Parks also argue that Addendum B refers to a February 19, 2005, agreement that does not exist. Again, this date does not correspond with the typed date of the 2005 PSA, but with the date upon which the 2005 PSA was signed by TMG. Neither the record nor the Parks provide another document to which Addendum B might refer. This is insufficient to demonstrate that the 2005 PSA did not include Addendum B.

The trial court properly concluded as a matter of law that the 2005 PSA complied with the statute of frauds. Therefore, the trial court did not abuse its discretion in denying the Parks' motion for summary judgment.

II.    Former Counsel Testimony

The Parks argue that the trial court improperly compelled their former attorney, [1] Gregory Home, to testify in response to questions from the jury. They contend that the

_____

[1] Home represented the Parks during the 2004 negotiations, but not during the 2005 transaction. Home became their attorney again after the 2005 transaction closing

8

court exacerbated this error by refusing to admit evidence that the Parks offered regarding one of the questions. This court reviews the trial court's decision to admit or exclude evidence for an abuse of discretion. State v. Gresham, 173 Wn.2d 405, 419, 269 P.3d 207 (2012).

On direct examination, Han Park testified about advice that Home gave them about the purchase price of the property. Park also testified that TMG paid Home to represent the Parks. As a result of this testimony, the jury sought to ask Home two questions. Despite the Parks' objections regarding the protections of the attorney-client privilege, the court ordered Home to testify as to the two limited questions. The questions are as follows:

> Did you as an attorney provide a letter to Mr. Park stating a legal opinion that the $180,000 was in addition to the purchase price and was indeed part of the contract? And did this event, this opinion, occur in 2004, 2005 or 2006?
>
> . . . .
>
> [M]r. Park testified that TMG, the McNaughton Group, retained you as their attorney, as the Parks [sic] attorney, on his behalf against his wishes. Did that occur?

Home responded to the first question by saying, "I don't recall." He responded, "No" to the second question.

The Parks then offered as an exhibit an e-mail containing Home's opinions about the purchase price of the property. TMG objected, arguing that the e-mail was sent

---

failed. He continued to represent the Parks through the early phases of the TMG lawsuit.

postclosing and was therefore irrelevant.[2] The trial court excluded the evidence on relevancy grounds.

A. Home's Testimony

The Parks argue that the trial court erred in requiring Home to testify. They rely on RCW 5.60.060(2)(a), which prohibits an attorney from testifying about professional advice given to a client without the client's consent. But, a client waives the privilege as to an entire confidential communication by testifying about part of that communication. State v. Vandenberg, 19 Wn. App. 182, 186, 575 P.2d 254 (1978).

Here, Han Park testified on direct examination that Home advised him that the Parks were entitled to an increased purchase price and that TMG had paid Home to represent the Parks. In doing so, he waived privilege as to Home's testimony on the same subjects.

B. Exclusion of E-mail

The Parks argue that the trial court further erred in excluding as irrelevant the e-mail containing Home's opinion. Relevant evidence is that having any tendency to prove or disprove a fact that is material to the determination of the action. ER 401. The court concluded that, in order for the e-mail to be relevant, the Parks would have needed to rely on Home's opinion in deciding not to close on September 11—the date of their alleged breach. Because the e-mail was dated September 13, the court reasoned, it was not relevant to the Parks' decision. The Parks' motive for refusing to close on the sale was in dispute, and their breach was the central issue in the case. An

_____

[2] While the e-mail is not provided in the record, based on the exhibit list it appears to be dated September 13, 2006, two days after the closing date.

e-mail sent after they refused to close would not necessarily prove or disprove the Parks' motives or be relevant to breach. Without the e-mail in the record, the panel cannot review it further.

The trial court did not abuse its discretion in admitting Home's testimony or excluding the e-mail containing his opinion.

III.    Evidence of Previous Real Estate Transactions

The Parks argue that the trial court erred in admitting two pieces of evidence regarding their prior real estate transactions. A trial court has broad discretion in ruling on evidentiary matters and will not be overturned absent manifest abuse of discretion. Cox v. Spangler, 141 Wn. 2d 431, 439, 5 P.3d 1265, 22 P.3d 791 (2000).

A. Purchase and Sale Agreement

The Parks first contest the admission of a contract involving their Edmonds property, which the Parks attempted to sell to Michelle Construction, Inc. in 2001. The Parks characterize the contract as evidence of "other acts" or "character traits" and contend that it was inadmissible under ER 404(b).

However, TMG offered the contract for impeachment purposes. ER 607 governs the use of impeachment evidence and provides that the credibility of a witness may be attacked by any party. If a plaintiff's testimony places his credibility at issue, the defendant may admit evidence to impeach the plaintiff's testimony. See, e.g., Tamburello v. Dep't of Labor & Indus., 14 Wn. App. 827, 828, 545 P.2d 570 (1976).

Here, Han Park testified that he did not have a prior sales contract with Michelle Construction. The trial court found that, Park thus opened the door for TMG to introduce the 2001 contract as impeachment evidence. The court also found that the

probative value outweighed the prejudicial effect. The trial court did not abuse its discretion in admitting this evidence.

B. Appellate Opinion

The Parks further challenge the admission of an appellate opinion demonstrating that the Parks had tried to purchase a piece of property in 1979, but that the deal had fallen through because of a dispute over contract terms. The Parks argue that this too was inadmissible evidence of "other acts" or "character traits" under ER 404.

Although evidence of prior acts are inadmissible to prove propensity on a particular occasion, they may be admissible for other purposes, including proof of motive, intent, modus operandi, or a common scheme or plan. Saldivar v. Momah, 145 Wn. App. 365, 395, 186 P.3d 1117 (2008). For example, a plaintiff may establish a common plan or scheme using evidence that a defendant committed similar acts of misconduct against similar victims under similar circumstances. Id. at 395.

In Saldivar, the trial court excluded evidence that the defendants, two brothers, used their similar appearances to impersonate each other in their professional lives. See id. at 394. The appellate court found that the exclusion was improper. Id. at 396. The court acknowledged that the proffered testimony would prove that the past impersonation took place at a different location during a different time period. Id. However, it found that the evidence's importance was the fact that the brothers engaged in professional impersonation—not when or where they did, or what harm ultimately resulted. Id.

Here, TMG offered the appellate opinion as evidence of the Parks' common scheme or plan. TMG's theory was that, in both the present case and in 1979, the

Parks attempted to enforce a contract term to which the other party had not initially agreed. Ultimately, the trial court admitted the opinion as evidence of a common scheme or plan under ER 404(b).

Like the evidence in Saldivar, the 1979 transaction is removed in time from the present case. See 145 Wn. App. at 396. But, it demonstrates that the Parks had engaged in similar behavior with a similar victim, suggesting that they had a common scheme or plan in approaching real estate deals with developers. The trial court also determined that the 1979 transaction had probative value that outweighed its prejudicial effect. This evidence was properly admitted.[3]

The trial court did not abuse its discretion in admitting evidence of the Parks' previous real estate transactions.

IV.    Factual Issues Conclusively Determined

The Parks contend that the trial court erroneously instructed the jury that three factual issues were conclusively determined.[4]

A proper jury instruction informs the jury about the applicable law and does not mislead the jury. State v. Bennett, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). Where no disputed facts exist about an issue, the court may decide that issue as a matter of

---

[3] Even if the trial court had erred in admitting this evidence, the error would be harmless. An error in admitting evidence of bad acts is harmless if the improperly admitted evidence is of little significance in light of the evidence as a whole. State v. Fuller, 169 Wn. App. 797, 831, 282 P.3d 126 (2012), review denied, 176 Wn.2d 1006, 297 P.3d 68 (2013). Here, the appellate opinion was only one of many pieces of evidence that TMG offered to support its allegations of breach of contract. Based on this other evidence, the jury could have reasonably concluded that the Parks breached the contract, even without evidence of the 1979 transaction.

[4] The Parks do not offer legal authority for their assignment of error. We infer that they are asserting a constitutional right to have these issues decided by the jury.

13

law. City of Seattle v. Davis, 174 Wn. App. 240, 245, 306 P.3d 961 (2012). This court reviews the superior court's conclusions of law de novo for whether they are supported by the findings of fact. In re Washington Builders Benefit Trust, 173 Wn. App. 34, 65, 293 P.3d 1206, review denied, 177 Wn.2d 1018, 304 P.3d 114 (2013).

The Parks challenge the instruction's statement that the 2005 PSA's description of the property was satisfactory. Whether an agreement violates the statute of frauds is a question of law. Maier, 154 Wn. App. at 15. As discussed above, the 2005 PSA contained a valid legal description of the property. The trial court was entitled to make this determination and so instruct the jury.

The Parks challenge the statement that substantial justification existed for TMG to file a lis pendens. A lis pendens may be filed in an action affecting the title to real property. RCW 4.28.320. A lis pendens is not proper where filed in anticipation of a money judgment. Bramall v. Wales, 29 Wn. App. 390, 395, 628 P.2d 511 (1981). Substantial justification for a lis pendens exists where a claimant has a reasonable basis in fact or in law to file the lis pendens. Udall v. T.D. Escrow Servs., Inc., 132 Wn. App. 290, 303, 130 P.3d 908 (2006), reversed on other grounds, 159 Wn.2d 903, 154 P.3d 882 (2007).

Here, TMG filed the lis pendens in its action seeking specific performance of the 2005 PSA. TMG released the lis pendens upon amending its complaint to include money damages. The trial court determined a contract existed and it was not disputed that the Parks had not participated in closing. The trial court noted that TMG believed that the Parks anticipatorily repudiated the 2005 PSA and breached by failing to close

14

on the property. The court thus properly found that substantial justification existed to file the lis pendens.

The Parks challenge the jury instruction's statement that the purchase price of the Parks' property was $2,425,000. TMG attached to its complaint a copy of the 2005 PSA, which demonstrates that the agreed purchase price for the property was $2,425,000. In their answer, the Parks attached their own copy of the 2005 PSA, which included an addendum reflecting that the parties agreed to raise the price to $2,580,000. This addendum bears only the Parks' initials. TMG disputed the addendum. In a pretrial order, the court found that the Parks failed to establish through competent evidence that TMG agreed to increase the sale price. It therefore ruled as a matter of law that the established contract price was $2,425,000. The Parks again attempted to introduce evidence concerning the sale price through the e-mail containing Home's opinion. The court excluded that evidence. The challenged jury instruction reflects the court's finding and the evidence presented about the purchase price of the Parks' home.

The court did not err in instructing the jury that these factual issues were conclusively determined.

## V.    Attorney Fees

The Parks request attorney fees and costs both at the trial level and on appeal. RAP 18.1(a) permits an attorney fee request if "applicable law grants to a party the right to recover" those fees. A party seeking fees under RAP 18.1 must support its request with argument and citation to authority. Phillips Bldg. Co. v. An, 81 Wn. App. 696, 705, 915 P.2d 1146 (1996). The Parks do not do so. We deny their request for fees.

15

TMG requests attorney fees under the fee shifting provision in the 2005 PSA. Under RCW 4.84.330, the prevailing party in an action to enforce or defend a contract is entitled to attorney fees and costs as provided by the contract. Reeves v. McClain, 56 Wn. App. 301, 311, 783 P.2d 606 (1989). The 2005 PSA provides that "[i]f Buyer or Seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonable attorneys' fees and expenses." TMG is the prevailing party here. It is entitled to fees and costs on appeal.

We affirm.

WE CONCUR: